IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 23-57114-jrs |
| RICHARD JOHN REYNOLDS, IV AKA RICH REYNOLDS, | CHAPTER: 13 |
| Debtor. | JUDGE: JAMES R. SACCA |
| WILMINGTON TRUST COMPANY NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS SUCCESSOR TRUSTEE TO BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION AS TRUSTEE FOR MORGAN STANLEY MORTGAGE LOAN TRUST 2007-14AR, | CONTESTED MATTER |
| Movant, | |
| v. | |
| RICHARD JOHN REYNOLDS, IV AKA RICH REYNOLDS, Debtor LEE MIMS REYNOLDS, Co-Debtor NANCY J. WHALEY, Trustee, | |
| Respondent(s). | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that **Wilmington Trust Company not in its individual capacity but solely as Successor Trustee to Bank of America, National Association as successor by merger to LaSalle Bank National Association as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR** has filed a Motion for Relief from the Automatic Stay and Co-Debtor Stay and related papers with the Court seeking an Order Granting Relief from the Automatic Stay and Co-Debtor Stay.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing on the **Motion for Relief from the Automatic Stay and Co-Debtor Stay** at 9:00 A.M., on November 30, 2023 in Courtroom 1404, United States Courthouse, 75 Ted Turner Drive SW, Atlanta, GA 30303, which may be attended in person or via the Court's Virtual Hearing Room. You may join the Virtual Hearing Room through the "Dial-in and Virtual Bankruptcy Hearing Information" link at the top of the homepage of the Court's website, www.ganb.uscourts.gov, or the link on the judge's

webpage, which can also be found on the Court's website. Please also review the "Hearing Information" tab on the judge's webpage for further information about the hearing. You should be prepared to appear at the hearing via video, but you may leave your camera in the off position until the Court instructs otherwise. Unrepresented persons who do not have video capability may use the telephonic dial-in information on the judge's webpage.

**NOTICE TO CO-DEBTOR:** This Motion seeks relief from the co-debtor stay pursuant to 11 USC Section 1301. If you do not file and serve a written objection to this Motion within 20 days from the date this Motion was filed, the Motion may be granted and the co-debtor stay may be terminated. Objections shall be filed with the Clerk, U.S. Bankruptcy Court, at the address shown in the next paragraph, and shall be served by U.S. Mail on the undersigned attorney whose name and address appear at the end of this notice.

**NOTICE TO DEBTOR:** Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleadings with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk before the hearing. The address of the Clerk's Office is Clerk, U.S. Bankruptcy Court, 75 Ted Turner Drive SW, Room 1340, Atlanta, GA 30303. You must also mail a copy of your response to the undersigned at the address stated below.

If a hearing on the Motion cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the Motion and agrees to a hearing on the earliest possible date. Movant consents to the automatic stay remaining in effect until the Court orders otherwise.

Dated: October 23, 2023

_Evan Durkovic_

Evan Durkovic, Bar No.: 948332
Attorney for Movant
Aldridge Pite, LLP
Six Piedmont Center
3525 Piedmont Road, N.E., Suite 700
Atlanta, GA 30305
Phone: (404) 994-7400
Fax: (619) 590-1385
Email: edurkovic@aldridgepite.com

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 23-57114-jrs |
| RICHARD JOHN REYNOLDS, IV AKA RICH REYNOLDS, | CHAPTER:  13 |
| Debtor. | JUDGE:  JAMES R. SACCA |
| WILMINGTON TRUST COMPANY NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS SUCCESSOR TRUSTEE TO BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION AS TRUSTEE FOR MORGAN STANLEY MORTGAGE LOAN TRUST 2007-14AR, | CONTESTED MATTER |
| Movant, | |
| v. | |
| RICHARD JOHN REYNOLDS, IV AKA RICH REYNOLDS, Debtor<br>LEE MIMS REYNOLDS, Co-Debtor<br>NANCY J. WHALEY, Trustee, | |
| Respondent(s). | |

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND THE CO-DEBTOR STAY

COMES NOW Movant named above and shows this Court the following:

1.      This Motion is made pursuant to Section 362(d) of the Bankruptcy Code for relief from the automatic stay and pursuant to Section 1301(c) of the Bankruptcy Code for relief from the co-debtor stay, for all purposes allowed by law and the contract between the parties, including, but not limited to, the right to foreclose on certain real property by a private power of sale contained in a certain Security Deed.

2.      Movant is the holder or the servicer of a loan secured by certain real property in which the Debtor has an interest. Said real property is security for a Promissory Note, and is commonly known as 380 Whitmore Drive NW, Atlanta, Georgia 30305.

3.      The Security Deed has been assigned to Movant as evidenced by an assignment of record.

4.      On or about June 26, 2012, Richard J. Reynolds and Lee M. Reynolds executed an agreement to modify the loan.

5.      There has been a default in mortgage payments which have come due since this case was filed. As of October 13, 2023, three (3) post petition payments (August 1, 2023 through October 1, 2023) of $4,632.30 each, totaling $13,896.90, have been missed.

6.      As of October 13, 2023, the total unpaid principal balance is $1,325,497.21, which includes the unpaid principal balance of $543,866.28 and deferred principal balance of $781,630.93.

7.      Because of the default and clear inability to make all required payments, Movant is not adequately protected. Movant's interest would also be irreparably harmed by the continuation of the co-debtor stay.

8.      Because the Loan Documents so provide, Movant is entitled to reasonable attorney's fees.

9.      Movant requests that in the event the Motion is granted, the Trustee be ordered to cease funding any balance of Movant's claim.

10.      Movant requests that the provisions of Fed. R. Bankr. P 4001(a)(3) be waived.

11.      PHH Mortgage Corporation services the underlying mortgage loan and note for the property referenced in this Motion for Relief for Wilmington Trust Company not in its individual

capacity but solely as Successor Trustee to Bank of America, National Association as successor by merger to LaSalle Bank National Association as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR, and is entitled to proceed accordingly.  Should the Automatic Stay be lifted and/or set aside by Order of this Court or if this case is dismissed or if the debtor obtains a discharge and a foreclosure action is commenced or recommenced, said foreclosure action will be conducted in the name of Wilmington Trust Company not in its individual capacity but solely as Successor Trustee to Bank of America, National Association as successor by merger to LaSalle Bank National Association as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR. Wilmington Trust Company not in its individual capacity but solely as Successor Trustee to Bank of America, National Association as successor by merger to LaSalle Bank National Association as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR has the right to foreclose because it is the original mortgagee or beneficiary or assignee of the security instrument for the referenced loan.  Wilmington Trust Company not in its individual capacity but solely as Successor Trustee to Bank of America, National Association as successor by merger to LaSalle Bank National Association as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR, directly or through an agent has possession of the promissory note and the promissory note is either made payable to Wilmington Trust Company not in its individual capacity but solely as Successor Trustee to Bank of America, National Association as successor by merger to LaSalle Bank National Association as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR, or has been duly endorsed.

12.     Movant requests that upon entry of an Order Granting this Motion and Lifting the Stay, the Chapter 13 Trustee make no further payments on account of Movant's secured claim, that the secured portion of Movant's claim be deemed withdrawn without prejudice to Movant's right to file  an amended unsecured claim for any deficiency and that absent a stipulation or order

to the contrary, Movant shall return to the Chapter 13 Trustee any payments received from the Trustee on account of Movant's secured claim, after entry of an Order Granting this Motion.

13.      Movant requests that it be permitted to contact the Debtor or Debtor's Counsel, as appropriate, through its agents, servicers and representatives for the purpose of engaging in discussions and consideration for possible loss mitigation options, solutions and resolutions, as appropriate with regard to the underlying Security Deed and Note, including, but not limited to loan modification or other loss mitigation alternatives

WHEREFORE, Movant prays for an Order lifting the automatic stay and co-debtor stay, authorizing it to proceed with the exercise of its private power of sale and to foreclose under its Loan Documents and appropriate state statutes, and for an award of reasonable attorney's fees. Movant also prays that Fed. R. Bankr. P. 4001(a)(3) be waived. Movant also prays that the Chapter 13 Trustee make no further payments on account of Movant's secured claim, that Movant be permitted to contact the Debtor or Debtor's Counsel, as appropriate, through its agents, servicers and representatives for the purpose of engaging in discussions and consideration for possible loss mitigation options, and for such other and further relief as is just and equitable.

Evan Durkovic, Bar No.: 948332
Attorney for Movant
Aldridge Pite, LLP
Six Piedmont Center
3525 Piedmont Road, N.E., Suite 700
Atlanta, GA 30305
Phone: (404) 994-7400
Fax: (619) 590-1385
Email: edurkovic@aldridgepite.com

Loan Number ███████

# ADJUSTABLE RATE NOTE
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

July 10, 2007                                    NORCROSS, GEORGIA

380 WHITMORE DRIVE NW
ATLANTA, GEORGIA 30305
(Property Address)

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$1,197,000.00**, (this amount is called "Principal"), plus interest, to the order of Lender. Lender is

**PRIMARY CAPITAL ADVISORS LC, A LIMITED LIABILITY COMPANY.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **7.500%**. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on September 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

PRIMARY CAPITAL ADVISORS, LC
PO BOX 724628
ATLANTA, GEORGIA 31139
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$8,369.60**. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of August, 2012, and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

---

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (As Published in *The Wall Street Journal*) - Single Family    Form 3520 1/01
Fannie Mae Uniform Instrument                    Page 1 of 4
MODIFIED for Prepayment Penalty by: IDS, Inc. - (800) 554-1872

Borrower(s) Initials _____

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND THREE FOURTHS** percentage point(s) (**2.750%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **13.500%** or less than **2.750%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) (**2.000%**) from the rate of interest I have been paying for the preceding SIX months. My interest rate will never be greater than **13.500%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

~~I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.~~

~~I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.~~

See Attached Prepayment Note Addendum.

Borrower's Initials: _____  _____  _____  _____

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of Principal and interest.. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

Borrower(s) Initials

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

---

**MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (As Published in** *The Wall Street Journal***) - Single Family**    **Form 3520 1/01**
**Fannie Mae Uniform Instrument**    Page 3 of 4
**MODIFIED for Prepayment Penalty by: IDS, Inc. - (800) 554-1872**

Borrower(s) Initials _____

*Loan Number* ▮▮▮▮▮▮▮

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
RICHARD J REYNOLDS          -Borrower    LEE MIMS REYNOLDS           -Borrower

*(Sign Original Only)*

STATE OF UTAH
COUNTY OF: SUMMIT
ON THE 11ST DAY OF July 2007
PERSONALLY APPEARED BEFORE ME
RICHARD & LEE REYNOLD (SIGNER(S) OF THE ABOVE
INSTRUMENT, WHO DULY ACKNOWLEDGED TO ME THAT
HE/SHE/THEY EXECUTED THE SAME

_____
NOTARY PUBLIC

NOTARY PUBLIC
P. ANDREW GARLAND
1100 Snow Creek Dr
PO Box 3809, Park City, UT 84060
My Commission Expires
June 20, 2010
STATE OF UTAH

PAY TO THE ORDER OF

WITHOUT RECOURSE

HEIDI MAJORS – VP
PRIMARY CAPITAL ADVISORS LC

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (As Published in *The Wall Street Journal*) - Single Family        Form 3520 1/01
Fannie Mae Uniform Instrument                    Page 4 of 4
MODIFIED for Prepayment Penalty by: IDS, Inc. - (800) 554-1872

STATE OF UTAH
COUNTY OF ______________
ON THE ________ DAY OF ______________
PERSONALLY APPEARED BEFORE ME
______________ SIGNER(S) OF ______________
INSTRUMENT, WHO DULY ACKNOWLEDGED TO ME THAT
HE/SHE/THEY EXECUTED THE SAME

______________
NOTARY PUBLIC

Deed Book 45494 Pg   119
Filed and Recorded Aug-06-2007 09:00am
2007-0226345
Georgia Intangible Tax Paid $3,591.00
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

RETURN TO:
JOHN P. CHEELEY, P.C.
5185 PEACHTREE PKWY
SUITE 380
NORCROSS, GA  30092

WHEN RECORDED, MAIL TO:
**PRIMARY CAPITAL ADVISORS LC**
**2100 RIVEREDGE PARKWAY SUITE 950**
**ATLANTA, GEORGIA 30328**

This Instrument was prepared by:
**PRIMARY CAPITAL ADVISORS LC**
**2100 RIVEREDGE PARKWAY SUITE 950**
**ATLANTA, GEORGIA 30328**
**(770) 226-81**

Loan Number: ▌▌▌▌▌▌

Order Number: _____  ____(Space Above This Line For Recording Data)_____

# SECURITY DEED

MIN:▌▌▌▌▌▌▌▌▌

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated July 18, 2007, together with all Riders to this document.

(B) **"Borrower"** is RICHARD J REYNOLDS & LEE MIMS REYNOLDS. Borrower is the grantor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the grantee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) **"Lender"** is PRIMARY CAPITAL ADVISORS LC. Lender is a A LIMITED LIABILITY COMPANY, organized and existing under the laws of GEORGIA.
Lender's address is 2100 RIVEREDGE PARKWAY SUITE 950, ATLANTA, GEORGIA 30328.

(E) **"Note"** means the promissory note signed by Borrower and dated July 18, 2007. The Note states that Borrower owes Lender ONE MILLION ONE HUNDRED NINETY-SEVEN THOUSAND and no/100 Dollars (U.S. $1,197,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2037.

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

| | | | |
|---|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider | |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ VA Rider | |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | | |
| ☒ Other (Specify) Waiver of Borrower's Rights Rider; | | | |

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS

Form 3011  1/01

Page 1 of 9

IDS, Inc. - (800) 554-1872

Borrower(s) Initials _____

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS, with power of sale, the following described property located in the County of FULTON:

SEE ATTACHED EXHIBIT "A"

Parcel Identification Number:

which currently has the address of **389 WHITMORE DRIVE NW**
**ATLANTA, GEORGIA 30305**                        ("Property Address"):

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to

bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

---

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                                         Form 3011 1/01
                                                        Page 3 of 9
IDS, Inc. - (800) 554-1872                                                              Borrower(s) Initials

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS                                      Form 3011   1/01
Page 4 of 9

EDS, Inc. - (800) 554-1372                                                                        Borrower(s) Initials ___

taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

GEORGIA- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS    Form 3011 1/01
Page 6 of 9
IDS, Inc. - (800) 554-1872    Borrower(s) Initials _____

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

25. Assumption Not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Witnesses:

_____          _____

_____ (Seal)          _____ (Seal)
RICHARD J REYNOLDS          -Borrower          LEE MIMS REYNOLDS          -Borrower

STATE OF GEORGIA,  UTAH          County ss:  SUMMIT

Signed, sealed and delivered in the presence of:



_____
Unofficial Witness

_____
Notary Public, County  SUMMIT
State of GEORGIA
UTAH

NOTARY PUBLIC
P. ANDREW GARLAND
1120 Snow Creek Dr
PO Box 5998, Park City, UT 84060
My Commission Expires
June 23, 2010
STATE OF UTAH

Loan Number:▇▇▇▇▇

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 10th day of July, 2007, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to

**PRIMARY CAPITAL ADVISORS LC, A LIMITED LIABILITY COMPANY**

("Lender") of the same date and covering the property described in the Security Instrument and located at:
**380 WHITMORE DRIVE NW**
**ATLANTA, GEORGIA 30305**
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 7.500%. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A)   Change Dates**
The interest rate I will pay may change on the 1st day of August, 2012, and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B)   The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

---

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*)-**
Single Family - Fannie Mae Uniform Instrument          Page 1 of 3                    Form 3138  1/01
IDS, Inc., (800)554-1872

Borrower(s) Initial _____

STATE OF UTAH
COUNTY OF, _Summit_
ON THE __11th__ DAY OF _July_ _2007_
PERSONALLY APPEARED BEFORE ME
_Summer Adams_, SIGNER(S) OF THE ABOVE
INSTRUMENT, WHO DULY ACKNOWLEDGED TO ME THAT
HE/SHE/THEY EXECUTED THE SAME

_____
NOTARY PUBLIC


NOTARY PUBLIC
P. ANDREW OARLAND
PO Box 6500, Park City, UT 84060
My Commission Expires
June 20, 2010
STATE OF UTAH

Deed Book 45494 Pg 129

Loan Number: █████████

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE FOURTHS percentage point(s) (2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 13.500% or less than 2.750%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage point(s) (2.000%) from the rate of interest I have been paying for the preceding SIX months. My interest rate will never be greater than 13.500%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)    Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL)-
Single Family - Fannie Mae Uniform Instrument          Page 2 of 3                    Form 3138  1/01
IDS, Inc., (800)554-1872

Borrower(s) Initials _____

STATE OF UTAH
COUNTY OF, _Summit_
ON THE _11th_ DAY OF _July_ _200?_
PERSONALLY APPEARED BEFORE ME
_Rumnol, or 20(000)_ SIGNER(S) OF THE ABOVE
INSTRUMENT, WHO DULY ACKNOWLEDGED TO ME THAT
HE/SHE/THEY EXECUTED THE SAME

_____
NOTARY PUBLIC

NOTARY PUBLIC
P. ANDREW GARLAND
1120 Snow Creek Dr
PO Box 1065, Park City, UT 84060
My Commission Expires
June 20, 2010
STATE OF UTAH

Loan Number ███████

sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the
expiration of this period, Lender may invoke any remedies permitted by this Security Instrument
without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
RICHARD J REYNOLDS       -Borrower       LEE MIMS REYNOLDS        -Borrower

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*)-**
Single Family - Fannie Mae Uniform Instrument       Page 3 of 3                                    Form 3138  1/01
IDS, Inc., (800)554-1872

STATE OF UTAH
COUNTY OF: _SUMMIT_
ON THE 11ᵗʰ ___ DAY OF _July 2022_
PERSONALLY APPEARED BEFORE ME.
_Richard J & Lee Mims Reynolds_ SIGNER(S) OF THE ABOVE
INSTRUMENT, WHO DULY ACKNOWLEDGED TO ME THAT
HE/SHE/THEY EXECUTED THE SAME

_____
NOTARY PUBLIC

NOTARY PUBLIC
P. ANDREW GARLAND
1100 Snow Creek Dr
PO Box 5595, Park City, UT 84060
My Commission Expires
June 20, 2019
STATE OF UTAH

All that certain property situated in the County of Fulton, and State of Georgia, being described as follows:

All that tract or parcel of land lying in and being in Land Lot 145 of the 17th District, Fulton County, being known as Lot 4, Block 17, Haynes Manor Subdivision, as per plat recorded at Plat Book 21, Page 25, Fulton County, Georgia Records, which plat is incorporated herein and mad a part hereof by reference.

Deed Book 45494 Pg 131
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

Aldridge Connors, LLP
Fifteen Piedmont Center
3575 Piedmont Road NE, Suite 500
Atlanta, GA 30305

APN #: 17-0145-0002-021
Recordation Requested by:
When Recorded Mail To:
Ocwen Loan Servicing, LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407

Deed Book 53144 Pg   354
Filed and Recorded Sep-17-2013 08:57am
2013-0251926
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

Attorney Code:
MIN:
MERS Ph.#: (888) 679-6377

## ASSIGNMENT OF DEED TO SECURE DEBT
## GEORGIA

This **ASSIGNMENT OF DEED TO SECURE DEBT** from **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS)**, as nominee for **PRIMARY CAPITAL ADVISOR LC** whose address is PO Box 2026 Flint, MI 48501-2026, its successors and assigns, ("Assignor) to **WILMINGTON TRUST COMPANY, SOLELY IN ITS CAPACITY AS TRUSTEE FOR MORGAN STANLEY MORTGAGE LOAN TRUST 2007-14AR MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-14AR** whose address is c/o Ocwen Loan Servicing,LLC, 5720 Premier Park Dr, West Palm Beach, FL 33407, (Assignee) all its rights, title and interest in and to a certain mortgage duly recorded in the Office of the County Recorder of FULTON County, State of GEORGIA, as follows:

Grantor: RICHARD J. REYNOLDS AND LEE M REYNOLDS
Grantee: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ACTING SOLELY AS NOMINEE FOR PRIMARY CAPITAL ADVISOR LC
Document Date: JULY 10, 2007
Amount: $1,197,000.00
Date Recorded: AUGUST 06, 2007
Book/Volume/Docket/Liber: 45494
Page/Folio: 119
Instrument : 2007-0226345
Property Address: 380 WHITMORE NW DRIVE, ATLANTA, GA 30305
This Assignment is made without recourse.
DATED: AUGUST 30, 2013

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC., ACTING SOLELY AS NOMINEE
FOR PRIMARY CAPITAL ADVISOR LC

BY:
NAME: **Noemi Morales**
TITLE: Vice President

ATTESTED BY:

NAME: Leticia N. Arias
TITLE: Assistant Secretary

Witness:
(1) Christopher Kelley

(2) Stephanie Simpson

STATE OF FLORIDA          )
                          )SS.
COUNTY OF PALM BEACH)

The foregoing instrument was acknowledged before me on this 30TH  day of AUGUST 2013 , by **Noemi Morales**, Vice President of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ACTING SOLELY AS NOMINEE FOR PRIMARY CAPITAL ADVISOR LC** on behalf of the corporation. He/She is personally known to me.

Notary Public – Christian J. Ferrer

Prepared By: Joe Simmons
Ocwen Loan Servicing,LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407
Phone Number: 561-682-8835



Notary Public State of Florida
Christian J Ferrer
My Commission EE 661670
Expires 12/30/2018

Deed Book 54888 Pg 613
Filed and Recorded May-01-2015 08:33am
2015-0163643
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia



Recording Requested By: OCWEN LOAN SERVICING, LLC
When Recorded Return To: OCWEN LOAN SERVICING, LLC 240 TECHNOLOGY DRIVE, IDAHO FALLS, ID 83401

### CORPORATE ASSIGNMENT OF SECURITY DEED

Fulton, Georgia
SELLER'S SERVIC████████████"REYNOLDS"-UPB
SELLER'S LENDE█
OLD SERVICING #█████

Date of Assignment:  APR 2 2 2015
Assignor: Wilmington Trust Company Solely in its capacity as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR Mortgage Pass-Through Certificates, Series 2007-14AR  at C/O OCWEN LOAN SERVICING, LLC., 1661 WORTHINGTON RD, SUITE 100, WEST PALM BEACH, FL  33409
Assignee: WILMINGTON TRUST COMPANY NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS SUCCESSOR TRUSTEE TO BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION AS TRUSTEE FOR MORGAN STANLEY MORTGAGE LOAN TRUST 2007-14AR at C/O OCWEN LOAN SERVICING, LLC., 1661 WORTHINGTON RD, SUITE 100, WEST PALM BEACH, FL  33409

Executed By: RICHARD J REYNOLDS & LEE MIMS REYNOLDS  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS"), SOLELY AS NOMINEE FOR PRIMARY CAPITAL ADVISORS LC, ITS SUCCESSORS AND/OR ASSIGNS
Date of Security Deed:  07/10/2007 Recorded:  08/06/2007  in Book/Reel/Liber: 45494 Page/Folio: 119 as Instrument No.: 2007-0226345  In the County of Fulton, State of Georgia.

Assessor's/Tax ID No. 17-0145-0002-021

Property Address: 380 WHITMORE DRIVE NW, ATLANTA, GA  30305

   KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $1,197,000.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

Wilmington Trust Company Solely in its capacity as Trustee for Morgan Stanley Mortgage Loan Trust 2007-14AR Mortgage Pass-Through Certificates, Series 2007-14AR
By Its Attorney in Fact Ocwen Loan Servicing, LLC

On  APR 2 2 2015

By: _____
    Joel A. Simmons
    Authorized Signer
WITNESS
SORIN CONSTANTINESCU

By: _____
    Yenifer Lorenzo
    Authorized Signer
WITNESS
    Samir Margetic

Deed Book 54888 Pg 614
Catheleme Robinson
Clerk of Superior Court
Fulton County, Georgia

CORPORATE ASSIGNMENT OF SECURITY DEED Page 2 of 2

STATE OF FLORIDA
COUNTY OF PALM BEACH

On ___APR 2 2 2015___, before me, ___Christian J. Ferrer___, a Notary Public in and for PALM BEACH
COUNTY in the State of FLORIDA, personally appeared ___Joe A. Simmons___ and
___Yenifer Lorenzo___, personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity, and that by his/her/their signature on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

___Christian J. Ferrer___
Notary Expires: 12/30/2016

Notary Public State of Florida
Christian J Ferrer
My Commission FF 062234
Expires 12/30/2016

(This area for notarial seal)

_____[Space Above This Line For Recording Data]_____

# LOAN MODIFICATION AGREEMENT
## (SHARED APPRECIATION)

**PLEASE READ THIS ENTIRE DOCUMENT CAREFULLY BEFORE SIGNING. THIS AGREEMENT AMENDS YOUR LOAN IN A NUMBER OF IMPORTANT WAYS, INCLUDING REDUCING THE PRINCIPAL YOU OWE. IF YOUR PROPERTY LATER APPRECIATES IN VALUE, HOWEVER, YOU WILL BE REQUIRED TO PAY BACK 25% OF THAT APPRECIATION CAPPED AT THE AMOUNT OF THE PRINCIPAL FORGIVENESS, LESS YOUR COST OF ANY IMPROVEMENTS.**

Borrower ("I" or "my"):  Richard J Reynolds Lee M Reynolds

Servicer ("Servicer"): Ocwen Loan Servicing, LLC, NMLS ▮▮▮▮▮▮

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 7/10/2007

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Property Address: 380 Whitmore Dr Nw Atlanta, GA 30305    ("Property")

Servicer is offering this Loan Modification Agreement ("Agreement"), dated 6/28/2012, which modifies the terms of Borrower's home loan obligations as described below:

A.   the Mortgage, Deed of Trust, or Security Deed (the "Mortgage"), dated and recorded in the public records of Fulton County,

B.   the Note, of the same date and secured by the Mortgage (the "Note"), which covers the real and personal property described in the Mortgage located at 380 Whitmore Dr Nw Atlanta, GA 30305 (the "Property").

**PURSUANT TO THE PROVISIONS OF O.C.G.A. § 44-14-1, ET SEQ., YOUR MORTGAGE, AS AMENDED BY THIS LOAN MODIFICATION AGREEMENT, IN ADDITION TO SECURING THE DEBT NAMED OR DESCRIBED IN THE INSTRUMENT SECURES ANY OTHER DEBT OR OBLIGATIONS THAT MAY BE OR BECOME OWING BY YOU (THE MORTAGOR OR GRANTOR) TO THE SERVICER (THE MORTAGEE OR GRANTEE) INCLUDING PRESENT AND FUTURE ADVANCES. FOR PURPOSES OF THE FOREGOING, THE TOTAL AMOUNT SECURED BY YOUR MORTGAGE ALSO SECURES AS A FUTURE ADVANCE THE "SHARED APPRECIATION AMOUNT" TO THE SAME EXTENT AS IF SUCH SHARED APPRECIATION AMOUNT WAS INCURRED ON THE DATE OF THE LOAN MODIFICATION AGREEMENT.**

Pursuant to our mutual agreement to modify Borrower's Note and Mortgage (collectively the "Loan Documents") and in consideration of the promises, conditions and terms set forth below, the parties agree as follows:

1    **Preconditions to Modification.** I understand and agree that:

A    TIME IS OF THE ESSENCE under this Agreement:

B    The Loan Documents shall not be modified unless and until (i) the Servicer receives from me the initial payment in the amount and by the date required under to Section 1.C. of this Agreement, (ii) the title insurance company insuring the lien of the Mortgage assures Servicer (or otherwise confirms to its satisfaction) that the Mortgage, as modified by this Agreement, continues to enjoy lien priority for the full amount of the Note and (iii) I receive from the Servicer a copy of this Agreement signed by the Servicer.

C   I shall make an initial payment of $4,233.95 on or before **8/1/2012**.

2   **The Modification**. If all preconditions to the modification set forth in Section 1 of this Agreement have been met, then the Loan Documents shall automatically become modified on 9/1/2012 (the "Modification Effective Date"). I understand that if I have failed to make any payments as a precondition to this modification, this modification will not take effect and this Agreement will not be effective. If this Agreement becomes effective, the Loan Documents will be modified to include the following new terms which are acknowledged and agreed:

A   **New Principal Balance**: The new principal balance of my Note shall be $1,344,505.93 (the "New Principal Balance"). This includes, to the extent permitted by law, all amounts and arrearages that are past due (including any unpaid late charges) less any amounts paid to the Servicer but not previously credited to my Loan. A portion of the New Principal Balance shall be deferred and may be forgiven as provided in Sections 2.B and 2.C. of this Agreement.

B   **Deferred Principal Balance**: $781,630.93 of the New Principal Balance shall be deferred (the "Deferred Principal Balance"). The Deferred Principal Balance shall be treated as a non-interest bearing principal forbearance and I am not obligated to pay interest or make monthly payments on any portion of it.

C   **Forgiveness of Deferred Principal Balance**: 100% of the Deferred Principal Balance is eligible for forgiveness in equal installments over three (3) years. Unless I default on my new payments to the extent that three (3) or more monthly payments become overdue and unpaid on the last day of any month, then the Servicer shall forgive one-third of the outstanding portion of my Deferred Principal Balance on each of the first, second and third anniversaries of the Modification Effective Date, respectively. Forgiveness of any such amounts will not result in a new payment schedule.

D   **Interest Bearing Principal Balance and Interest Rate**: The portion of the New Principal Balance that is not deferred (i.e., New Principal Balance less Deferred Principal Balance) shall bear interest (the "Interest Bearing Principal Balance"). The Interest Bearing Principal Balance shall be $562,875.00 and interest at the rate of 2.00000% shall begin to accrue thereon as of 9/1/2012. If a default rate of interest is permitted under the Loan Documents, then in the event of any default under the Loan Documents, as amended by this Agreement, the interest that will be due will be the rate set forth in this Section 2.D.

E   **New Payment Date, Schedule and Amounts to be Repaid**: The first new monthly payment on the Interest Bearing Principal Balance shall be due on 9/1/2012.

The payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| *1-Loan's Maturity | 2.00000% | 9/1/2012 | $2,385.77 | $1,848.18, may adjust periodically | $4,233.95, may adjust periodically | 9/1/2012 | 300 |

e escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

I shall pay in full the Interest Bearing Principal Balance, all accrued and unpaid interest thereon and all other amounts due and owing by the earliest of: (i) the date on which my Note matures and is due and payable in full (the "Maturity Date"), (ii) a refinance or payoff of the entire Interest Bearing Principal Balance (a "Refinance Transaction"), or (iii) a sale or any transfer of the Property or a beneficial interest in the Property without the Servicer's consent that may require immediate payment in full under the terms of the Loan Documents (a "Sale Transaction"). I may also be required to pay the "Shared Appreciation Amount" as provided in Section 3 of this Agreement.

F   **Pre-Payment of Note**: Provided I am not in default under the terms of this Agreement, in any pre-payment of the Note more than thirty (30) calendar days after the Modification Effective Date, the portion of the Deferred Principal Balance not yet forgiven pursuant to Section 2.C. shall be deducted from the payoff amount.

G   The terms in this Section 2 shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, any provisions for an adjustable, step or simple interest rate, interest-only or other payment options, or any negative amortization features that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance. **I WILL BE IN DEFAULT IF I DO NOT COMPLY WITH THE TERMS OF THE LOAN DOCUMENTS, AS MODIFIED BY THIS AGREEMENT.**

3   **Shared Appreciation**.

**IF THE PROPERTY SECURING THE NOTE INCREASES IN VALUE AFTER THE MODIFICATION EFFECTIVE DATE, THERE MAY BE AN ADDITIONAL PAYMENT DUE, DEFINED IN THIS AGREEMENT AS THE "SHARED APPRECIATION AMOUNT". THE SHARED APPRECIATION AMOUNT RECOGNIZES CERTAIN IMPROVEMENTS I MAY MAKE TO THE PROPERTY IN THE FUTURE. IN NO EVENT SHALL THE SHARED APPRECIATION AMOUNT COLLECTED BE MORE THAN MY DEFERRED PRINCIPAL BALANCE ( $781,630.93).**

A.   In addition to the amounts I am obligated to pay pursuant to Section 2 of this Agreement, upon the earliest of (i) the Maturity Date, (ii) a Refinance Transaction, or (iii) a Sale Transaction, I shall also pay principal in an amount equal to 25% of the future increase in value, if any, of the Property as more fully described below. This additional payment of principal is referred to in this Agreement as the "Shared Appreciation Amount". The Shared Appreciation Amount shall be determined by the Servicer as follows. (Note, the terms "Valuation" and "Subsequent Capital Improvements" as used below are defined in Sections 3.B and 3.C of this Agreement).

   I   **Maturity Date**: The Shared Appreciation Amount, if any, at the Maturity Date shall be 25% of the difference between the Valuation of the Property as of such date and    $562,875.00 (the Interest Bearing Principal Balance as of the Modification Effective Date) less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance.

   II   **Refinance Transaction**: The Shared Appreciation Amount, if any, in connection with a Refinance Transaction shall be 25% of the difference between the Valuation of the Property as of the closing date of the Refinance Transaction and    $562,875.00 (the Interest Bearing Principal Balance as of the Modification Effective Date) less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance.

   III   **Sale Transaction:** If the Property is sold, the manner in which the Shared Appreciation Amount, if any, is determined by the Servicer depends on whether or not the sale is at "Arm's Length." If the purchaser is a party unrelated to the seller, then the Servicer will generally determine that the transaction is Arm's Length. If, however, the purchaser is related to the seller, or other circumstances indicate that the transaction was not Arm's Length, or if there is a transfer of the Property or any beneficial interest in the Property without the Servicer's consent that may require immediate payment in full under the terms of the Loan Documents, then the Servicer may determine that the Sale Transaction is not Arm's Length.

      a   If the Sale Transaction is Arm's Length, then the Shared Appreciation Amount, if any, will be equal to 25% of the difference between the gross sale price of the Property and    $562,875.00 (the Interest Bearing Principal Balance of the Modification Effective Date), less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance .

      b   If the Sale Transaction is not Arm's Length, then the Shared Appreciation Amount, if any, will be equal to 25% of the difference between the Valuation of the Property (as defined in Section 3.B.) as of the date of the sale or transfer and    $562,875.00 (the Interest Bearing Principal Balance as of the Modification Effective Date), less (i) any credit determined by Servicer for Subsequent Capital Improvements and (ii) any amount of appreciation in excess of the Deferred Principal Balance.

B.   "Valuation" shall mean the dollar amount of the value of the Property determined by the Servicer under the following terms and conditions. In all of the circumstances enumerated in Section 3.A. other than an Arm's Length Sale Transaction, the Valuation shall include a Property appraisal from an independent licensed appraiser and, at Servicer's

3

option, a third-party valuation based on such appraisal. I acknowledge and agree that such appraisal and third-party valuation (if any) are acceptable to me for assessing the value of the Property.

I also agree to provide Servicer with written notice of my intent to cause or permit a Refinance Transaction or Sale Transaction no more than sixty (60) days and not less than thirty (30) days in advance of said Refinance Transaction or Sale Transaction. At the time notice is provided, I agree to deliver documentation to the Servicer evidencing the gross amount of proceeds expected from or to be paid under such Refinance Transaction to enable Servicer to establish a Valuation of the Property and determine the Shared Appreciation Amount with respect to the Refinance Transaction. In the case of a Sales Transaction, I agree to provide the sales contract and any other information reasonably required by Servicer to enable Servicer to determine (i) whether or not it is an Arm's Length transaction and (ii) the Shared Appreciation Amount with respect to the Sales Transaction. I further agree and acknowledge that failure to provide the required notice of a Refinance Transaction or Sale Transaction may result in a delay in the Refinance Transaction or Sale Transaction and in my ability to pay off the Note and get the Mortgage released or reconveyed. **I agree that Servicer will not be responsible for any loss, damage, expense, claim, proceeding, cause of action, encumbrance, order, charge, cost or reduction in value caused or contributed to, directly or indirectly, by my failure to give such written notice of a Refinance Transaction or Sale Transaction to Servicer.**

C. "Subsequent Capital Improvements" that will qualify for credit under the Shared Appreciation Amount include only those improvements that are initiated and completed after the Modification Effective Date and are permanent structural improvements that have directly enhanced the value of the property. Repairs to the Property do not qualify as a Subsequent Capital Improvement. Servicer shall use the general guidelines adopted by the Internal Revenue Service to determine the difference between a Subsequent Capital Improvement and a repair. I agree to provide Servicer with the necessary support documentation, including, but not limited to, invoices and payment confirmation so that Servicer can determine whether any amounts for Subsequent Capital Improvements should be credited to the Shared Appreciation Amount. I acknowledge that failure to provide the necessary support documentation will result in no credit being provided for any Subsequent Capital Improvement I performed to the Property.

**4**     **Additional Agreements**. I agree to the following:

A     That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Servicer has waived this requirement in writing.

B     That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Servicer.

C     That this Agreement constitutes notice that the Servicer's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account.

If this loan is currently escrowed for either taxes or insurance or both taxes and insurance, then Servicer will continue to collect the applicable escrow amount in addition to the monthly principal and interest payment. I agree to pay Servicer on the day payments are due under the Note and Mortgage as amended by this Agreement, until the loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Servicer under the Note and Mortgage; (d) mortgage insurance premiums, if any, or any sums payable to Servicer in lieu of the payment of mortgage insurance premiums in accordance with the Note and Mortgage; and (e) any community association dues, fees, and assessments that Servicer requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Servicer all notices of amounts to be paid under this Section 4.C. I shall pay Servicer the Funds for Escrow Items unless Servicer waives my obligation to pay the Funds for any or all Escrow Items.

Servicer may waive my obligation to pay to Servicer Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Servicer and, if Servicer requires, shall furnish to Servicer receipts evidencing such payment within such time period as Servicer may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Note and Mortgage, as the phrase "covenant and agreement" is used therein. If I am obligated to pay Escrow Items

4

directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Servicer may exercise its rights under the Note and Mortgage and this Agreement and pay such amount and I shall then be obligated to repay to Servicer any such amount. Servicer may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Note and Mortgage, and, upon such revocation, I shall pay to Servicer all Funds, and in such amounts, that are then required under this Section 4.C.

Servicer may, at any time, collect and hold Funds in an amount (a) sufficient to permit Servicer to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA") and (b) not to exceed the maximum amount a Servicer may require under RESPA. Servicer shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Servicer, if Servicer is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Servicer shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Servicer shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Servicer pays me interest on the Funds and applicable law permits Servicer to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Servicer shall not be required to pay me any interest or earnings on the Funds. Servicer and I may agree in writing, however, that interest shall be paid on the Funds. Servicer shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Servicer shall account to me for the excess funds in accordance with RESPA. If there is a shortage or deficiency of Funds held in escrow, as defined under RESPA, Servicer shall notify me as required by RESPA, and I shall pay to Servicer the amount necessary to make up the shortage or deficiency in accordance with RESPA, but in no more than twelve (12) monthly payments.

Upon payment in full of all sums secured by the Note and Mortgage and this Agreement, Servicer shall promptly refund to me any Funds held by Servicer.

D   That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Servicer and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

E   That, as of the Modification Effective Date, I understand that the Servicer will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

F   That, I will cooperate fully with Servicer in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Servicer's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Servicer does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

G   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Servicer's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement. I agree to deliver any such corrective documents within ten (10) days after I receive the Servicer's written request for such replacement.

H   That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage

5

insurance may change as a result of the New Principal Balance.

I   Severability: Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement..

J   In the case of multiple Borrowers, references to "I" and "my" throughout this Agreement shall mean "we" and "our", respectively.

In Witness Whereof, the Servicer and I have executed this Agreement.

Sign Here →  _Richard J Reynolds_          06 / 26 / 2012 Date

Sign Here →  _Lee M Reynolds_          06 / 26 / 2012 Date

---

*All individuals on the title (even if not a borrower on the note) must sign this agreement. If there are more than two title holders to this property, please have them sign below. If no other title holders exist, please leave this section blank and return it with the rest of the agreement.

Sign Here →  _____          ____ / ____ / _____ Date

Sign Here →  _____          ____ / ____ / _____ Date

---

_____   BY  _____
Servicer

_____
Date
If applicable: _____
        Mortgage Electronic Registration Systems, Inc. – Nominee for Servicer

6



## BALLOON DISCLOSURE

Borrower(s) ("I" or "me"):  Richard J Reynolds Lee M Reynolds

Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*

Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 7/10/2007

Property Address:        380 Whitmore Dr Nw Atlanta, GA 30305

THIS BALLOON DISCLOSURE is made this 28th day of June, 2012, and is incorporated into and shall be deemed to supplement the Modification Agreement (the "Agreement") of the same date given by the undersigned Borrower(s). The Agreement contains a balloon feature that requires the Borrower(s) to make an additional payment based on the future appreciation of the Property.

This means that even if I make all payments full and on time, the loan will not be paid in full by the final payment date. A single balloon payment will be due and payable in full on 8/1/2037, provided that all payments are made in accordance with the loan terms and the interest rate does not change for the entire loan term. The balloon payment may vary depending on the Shared Appreciation Amount as determined at the time of maturity.

Neither Ocwen Loan Servicing, LLC nor any lender to which this loan is transferred or assigned is under any obligation to finance the amount of the balloon payment. In addition, the value of the real estate securing this loan may change during the term of the loan. On the date the balloon payment becomes due, the value of the real estate may not be sufficient to secure a new loan in an amount equal to the balloon payment.

I/we have read the above disclosure and acknowledge receiving a copy by signing below.

_____        06/28/2012
Borrower                                    Date

_____        06/28/2012
Borrower                                    Date

# SHARED APPRECIATION DISCLOSURE

## Important disclosure about the agreement in which you pay a part of any future increase in the value of your home. Please read carefully.

Borrower(s) ("I" or "me"): Richard J Reynolds Lee M Reynolds
Servicer ("Servicer"): *Ocwen Loan Servicing, LLC*
Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 7/10/2007

Property Address: 380 Whitmore Dr Nw Atlanta, GA 30305    ("Property")

THIS SHARED APPRECIATION DISCLOSURE is made this 28th day of June, 2012, and is incorporated into and shall be deemed to supplement the Modification Agreement (the "Agreement") of the same date given by the undersigned Borrower(s). The Agreement contains a shared appreciation feature that requires the Borrower(s) to make an additional payment based on the future appreciation of the Property.

## SHARED APPRECIATION AMOUNT

I agree to share in any future appreciation of the market value of the Property that occurs between the date of modification and the date the Property is sold, refinanced or the Loan reaches maturity. The Shared Appreciation Amount recognizes certain improvements made to the property after the Modification Effective Date. In no event shall the Shared Appreciation Amount collected be more than the Deferred Principal Balance. The following are examples of how such shared appreciation may be calculated.

## EXAMPLES

This share appreciation modification is available to borrower(s) whose unpaid principal balance exceeds the market value of their Property. Under the shared appreciation modification, the total debt amount owed would be reduced, resulting in a new principal balance made up of two parts: (i) an Interest Bearing Principal Balance that has been adjusted based upon the market value at the time of modification and (ii) a Deferred Principal Balance that does not bear interest and is eligible to be forgiven over a three (3) year period.

For purposes of this disclosure, the scenarios below are based on the following modification terms:

- A market value of $100,000 at the time of modification.
- A New Principal Balance of $130,000.
- An Interest Bearing Principal Balance of $100,000.
- A Deferred Principal Balance of $30,000.

After four (4) years of making each monthly payment on time, I decide to sell the Property and receive an Arm's Length offer to purchase from an unrelated third party in the amount of:

## 1   $100,000, EQUIVALENT TO NO APPRECIATION AFTER THE MODIFICATION

Since the market value of the Property remained the same from the date of modification to the date I decided to sell the Property, I would owe a Shared Appreciation Amount of $0.

- All $30,000 of Deferred Principal Balance would have been already forgiven.
- The Shared Appreciation Amount would be equal to 25% of $0 in appreciation (25% x $0 = $0) or $0.
- Therefore, I would not be required to pay anything as the Shared Appreciation Amount.

## 2   $120,000, EQUIVALENT TO AN APPRECIATION OF TWENTY PERCENT (20%) AFTER THE MODIFICATION

Since the market value of the Property increased from $100,000 to $120,000 from the date of modification to the date I decided to sell the Property, I would owe a total Shared Appreciation Amount of $5,000.

- All $30,000 of Deferred Principal Balance would have been already forgiven.

- The Shared Appreciation Amount would be equal to 25% of the $20,000 in total appreciation (($120,000 - $100,000) x 25% = $5,000) or $5,000.
- Since the Shared Appreciation Amount of $5,000 is <u>less than</u> the Deferred Principal Balance ($30,000), I would be required to pay $5,000 as the Shared Appreciation Amount.
- I would receive the remaining 75% of the appreciation or $15,000 ($20,000 - $5,000 = $15,000).

**3   $120,000, EQUIVALENT TO AN APPRECIATION OF TWENTY PERCENT (20%) AFTER THE MODIFICATION (WITH A SUBSEQUENT CAPITAL IMPROVEMENT MADE TO THE PROPERTY.)**

Similar to example number 2 above, the market value of the Property increased from $100,000 to $120,000 from the date of modification to the date I decided to sell the Property. However, in this instance, I have also produced evidence of a $5,000 Subsequent Capital Improvement made to the property after the modification effective date. As a result, I would receive a credit for the Subsequent Capital Improvement and owe a total Shared Appreciation Amount of $3,750.

- All $30,000 of Deferred Principal Balance would have been already forgiven.
- The Shared Appreciation Amount would be equal to 25% of the $15,000 in appreciation achieved after deduction of the $5,000 for the Subsequent Capital Improvement (($120,000 - $100,000 - $5,000) x 25% = $3,750) or $3,750.
- Since the Shared Appreciation Amount of $3,750 is <u>less than</u> the Deferred Principal Balance ($30,000), I would be required to pay $3,750 as the Shared Appreciation Amount.
- I would receive a full credit of $5,000 for the Subsequent Capital Improvement <u>plus</u> the remaining 75% of the appreciation or $11,250 ($15,000 - $3,750 = $11,250).

**4   $225,000, EQUIVALENT TO AN APPRECIATION OF ONE HUNDRED AND TWENTY FIVE PERCENT (125%) AFTER THE MODIFICATION**

Since the market value of the Property increased from $100,000 to $225,000 from the date of modification to the date I decided to sell the Property, I would owe a total Shared Appreciation Amount of $30,000.

- All $30,000 of Deferred Principal Balance would have been already forgiven.
- The Shared Appreciation Amount would be equal to 25% of the $125,000 in appreciation (($225,000 - $100,000) x 25% = $31,250) or $31,250.
- Since the Shared Appreciation Amount of $31,250 is <u>greater than</u> the Deferred Principal Balance ($30,000), I would only be required to pay $30,000 as the Shared Appreciation Amount.
- I would receive the remaining 75% of the appreciation ($93,750) <u>plus</u> an additional $1,250 ($31,250 - $30,000) because the amount of appreciation actually due cannot exceed the total Deferred Principal Balance of $30,000.

**OTHER CONSIDERATIONS**

1   Borrower(s) should seek independent counseling from a lawyer, a HUD-certified mortgage counselor and/or a tax advisor regarding (A) the trade-off between a current reduction in the size of the mortgage versus the promise to give up part of the future appreciation of your Property, and (B) the tax consequences of the principal forgiveness and shared appreciation features of the Agreement.

2   The U.S. Department of Housing and Urban Development list of approved housing counselors may be found at: http://www.hud.gov/offices/hsg/sfh/hcc/fc/

3   The Agreement could have an effect on future refinancing of the Property. If I refinance or pay off the Note after entering into this Agreement, I will be required to pay part of the appreciation in the value of the Property as described in the Agreement.

I/we have read the above disclosure and acknowledge receiving a copy by signing below.

_____        06/26/2012
Borrower                                              Date

_____        06/26/2012
Borrower                                              Date

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE:                                              Case No. 23-57114-JRS

RICHARD JOHN REYNOLDS, IV AKA                      Chapter 13
RICH REYNOLDS,

              Debtor.

**CERTIFICATE OF SERVICE**

This is to certify that on this day I electronically filed the foregoing **Notice of Hearing and Motion for Relief from the Automatic Stay and Co-Debtor Stay** the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

**The following parties have been served via e-mail**:

Nancy J. Whaley

I further certify that on this day I caused a copy of this document to be served via United States First Class Mail, with adequate postage prepaid on the following parties set forth below at the address shown for each.

Richard John Reynolds, IV                    Lee Mims Reynolds
380 Whitmore Drive NW                        380 Whitmore Drive NW
Atlanta, GA 30305                            Atlanta, GA 30305

**I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

                                    _Evan Durkovic_
                                    Evan Durkovic, Bar No.: 948332
                                    Attorney for Movant
                                    Aldridge Pite, LLP
                                    Six Piedmont Center
                                    3525 Piedmont Road, N.E., Suite 700
                                    Atlanta, GA 30305
                                    Phone: (404) 994-7400
                                    Fax: (619) 590-1385
                                    Email: edurkovic@aldridgepite.com